## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

KATHERINE MERA,

Appellant,

v.

PAMELA BONDI,

Attorney General of the United States,

Appellee.

On Appeal from the United States
District Court for the District of Columbia

## BRIEF FOR APPELLEE

EDWARD R. MARTIN, JR.
United States Attorney

JANE M. LYONS
Assistant United States Attorney

BRADLEY G. SILVERMAN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-2575

Civ. A. No. 20-2127          *Attorneys for the United States of America*

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**Parties and Amici.** The plaintiff-appellant is Katherine Mera. The defendant-appellee is Pamela Bondi, Attorney General of the United States. There is no amicus curiae.

**Ruling Under Review.** At issue in this appeal is the March 25, 2024, memorandum opinion and order by Judge Beryl A. Howell granting the Attorney General summary judgment. The opinion is available in the joint appendix, JA930, and on Westlaw, 2024 WL 1253856.

**Related Cases.** This case has not previously been before this Court. Undersigned counsel is unaware of any pending related cases.

# TABLE OF CONTENTS

| **Heading** | **Page** |
|---|---|

Certificate as to Parties, Rulings, and Related Cases ...............................i

Table of Contents...........................................................................ii

Table of Authorities ........................................................................v

Introduction ...................................................................................1

Jurisdictional Statement....................................................................1

Statement of Issue ..........................................................................1

Statement of the Case .....................................................................2

I.    Mera Misuses Her Government Credit Card for Nine Years..........3

II.   Mera's Accommodation Record ........................................5

III.  Mera's 2016-17 Appraisal .................................................6

IV.   Mera's 2017-18 Midterm Review ......................................7

V.    Mera's Unacceptable 2017-18 Performance Appraisal...................8

VI.   Mera's Placement on a Performance Improvement Plan ..............11

      A.    Communication and Customer Service.................................11

      B.    Accountability for Organizational Results............................14

      C.    Fiscal Responsibility/Taxpayer Value.................................15

VII.  Mera's Proposed Removal ...........................................17

      A.    First Critical Element: Communication and Customer
            Service .................................................................18

        1.     Task 1: Formulating Technically Correct Answers.....18

        2.     Task 2: Facilitation of the Project Coordinators Call..18

B.    Second Critical Element: Accountability for Organizational Results .........................................................19

        1.     Task 2: Award Package (Redbooking).........................19

        2.     Task 4: Program Plan ..................................................19

C.    Third Critical Element: Fiscal Responsibility/Taxpayer Value........................................................................20

        1.     Task 2: Monitoring Visit..............................................20

        2.     Task 4: Budgets...........................................................21

        3.     Task 5: Progress Review Reports .................................21

VIII. Mera's Removal ...............................................................21

A.    First Critical Element: Communication and Customer Service ...................................................................23

        1.     Task 1: Formulating Technically Correct Answers.....23

        2.     Task 2: Facilitation of the Project Coordinators Call..24

B.    Second Critical Element: Accountability for Organizational Results .........................................................25

        1.     Task 2: Award Package (Redbooking).........................25

        2.     Task 4: Program Plan ..................................................26

C.    Third Critical Element: Fiscal Responsibility/Taxpayer Value........................................................................26

        1.     Task 2: Monitoring Visit..............................................26

  2.  Task 4: Budgets ............................................................. 27

  3.  Task 5: Progress Review Reports ................................. 27

IX. Procedural History ................................................................. 28

Summary of the Argument ............................................................... 29

Standard of Review ........................................................................... 29

Argument ............................................................................................ 30

  A. Formulating Technically Correct Answers ......................... 39

  B. Facilitation of the Project Coordinators Call ..................... 41

  C. Award Package (Redbooking) .............................................. 44

  D. Program Plan ....................................................................... 46

  E. Monitoring Visit ................................................................... 51

  F. Budgets .................................................................................. 52

  G. Progress Reports .................................................................. 54

Conclusion ........................................................................................... 57

Certificate of Compliance ................................................................. 58

Certificate of Service ........................................................................ 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Tamimi v. Adelson,*
916 F.3d 1 (D.C. Cir. 2019) ................................................... 30

*Appalachian Power Co. v. EPA,*
251 F.3d 1026 (D.C. Cir. 2001) .......................................... 50, 51, 52, 53

*Bastani v. Am. Fed'n of Gov't Emps.,*
70 F.4th 563 (D.C. Cir. 2023) .............................................. 29

*Bode & Grenier, LLP v. Knight,*
808 F.3d 852 (D.C. Cir. 2015) .............................................. 30

*Brady v. Off. of Sergeant at Arms,*
520 F.3d 490 (D.C. Cir. 2008) ......................................... 33, 36

*Camara v. Mastro's Rests. LLC,*
952 F.3d 372 (D.C. Cir. 2020) ......................................... 47, 48

*Carpenter v. Fed. Nat'l Mortg. Ass'n,*
174 F.3d 231 (D.C. Cir. 1999) .............................................. 49

*DeJesus v. WP Co.,*
841 F.3d 527 (D.C. Cir. 2016) .............................................. 33

*Desmond v. Mukasey,*
530 F.3d 944 (D.C. Cir. 2008) .............................................. 36

*Fischbach v. D.C. Dep't of Corr.,*
86 F.3d 1180 (D.C. Cir. 1996) .............................................. 35

*George v. Leavitt,*
407 F.3d 405 (D.C. Cir. 2005) .............................................. 35

**Cases (cont.)**

*Giles v. Transit Emps. Fed. Credit Union*,
  794 F.3d 1 (D.C. Cir. 2015) .............................................................. 32, 35

*Hairston v. Vance-Cooks*,
  773 F.3d 266 (D.C. Cir. 2014) ..................... 35, 37, 41, 42, 45, 49, 54, 55

*Hartzler v. Mayorkas*,
  No. 22-5310, 2024 WL 3219489 (D.C. Cir. June 28, 2024) ..... 33, 37, 41, 42, 47, 49

*Hosp. Menonita De Guayama, Inc. v. Nat'l Lab. Rels. Bd.*,
  94 F.4th 1 (D.C. Cir. 2024) .................................................................. 30

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*,
  988 F.3d 948 (7th Cir. 2021) ................................................................ 49

*Jeffries v. Barr*,
  965 F.3d 843 (D.C. Cir. 2020) .............................................................. 32

*Katopothis v. Windsor-Mount Joy Mut. Ins. Co.*,
  897 F.3d 291 (D.C. Cir. 2018) .............................................................. 30

*Kersey v. Wash. Metro. Area Trans. Auth.*,
  586 F.3d 13 (D.C. Cir. 2009) ................................................... 31, 32, 33

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .............................................................................. 47

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) .............................................................................. 31

*McGrath v. Clinton*,
  666 F.3d 1377 (D.C. Cir. 2012) ............................................................ 37

**Cases (cont.)**

*Minter v. Dist. of Columbia,*
    809 F.3d 66 (D.C. Cir. 2015) ................................................ 32

*Morris v. McCarthy,*
    825 F.3d 658 (D.C. Cir. 2016) .............................................. 36

*Nat'l Sec. Archive v. CIA,*
    752 F.3d 460 (D.C. Cir. 2014) .............................................. 47

*Paquin v. Fed. Nat'l Mortg. Ass'n,*
    119 F.3d 23 (D.C. Cir. 1997) ................................................ 31

*Roberts v. Int'l Bus. Machines Corp.,*
    733 F.3d 1306 (10th Cir. 2013) ............................................ 49

*Royall v. Nat'l Ass'n of Letter Carriers,*
    548 F.3d 137 (D.C. Cir. 2008) .............................................. 38

*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................ 30

*Solomon v. Vilsack,*
    763 F.3d 1 (D.C. Cir. 2014) ...................................... 36, 37, 43

*Terry v. Reno,*
    101 F.3d 1412 (D.C. Cir. 1996) ............................................ 30

*Vatel v. All. of Auto. Mfrs.,*
    627 F.3d 1245 (D.C. Cir. 2011) .................................. 35, 36, 48

*Waggel v. George Wash. Univ.,*
    957 F.3d 1364 (D.C. Cir. 2020) ............................................ 32

**Cases (cont.)**

*Walker v. Johnson,*
    798 F.3d 1085 (D.C. Cir. 2015) ............................................... 36

*Waterhouse v. District of Columbia,*
    298 F.3d 989 (D.C. Cir. 2002) ................................................. 37

*Woodruff v. Peters,*
    482 F.3d 521 (D.C. Cir. 2007) ............................... 32, 38, 39, 40

**Statutes**

28 U.S.C. § 1291 ....................................................................... 1, 5

28 U.S.C. § 1331 .......................................................................... 1

**Rules**

Fed. R. App. P. 32(a)(7)(B) ........................................................ 58

Fed. R. Civ. P. 56(a) .................................................................. 29

**Regulations**

5 C.F.R. § 432.104 ...................................................................... 11

## INTRODUCTION

Even as Appellant Katherine Mera's work performance steadily declined, Appellee Department of Justice (the "Department") extended her numerous opportunities to improve. But when Mera's performance remained unacceptable even after a Performance Improvement Plan, the Department finally removed her. Because no reasonable fact-finder could find that the Department's reason for removing Mera—her unacceptable performance—was a pretext for unlawful discrimination or retaliation, this Court should affirm the district court's grant of summary judgment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

In the opinion of the United States, the question presented is:

Whether a trier of fact reasonably could find that the Department's evidence of Mera's unacceptable performance of her duties, even after a period of support and opportunity for improvement, was a mere pretext for discrimination based on disability or retaliation for protected activity.

## STATEMENT OF THE CASE

Mera joined the Department in 1997 and worked at the Office of Violence Against Women (the "Office") from 2001 until her removal on March 25, 2020. Compl. (R.2) ¶ 5, JA13; 1st Mera Aff. (R.27-3) at 2, JA59; Mera Dep. (R.27-3) at 41-42, JA98-99. For much of that time, Mera worked as a Grant Program Specialist in the Office's Campus Unit (the "Unit"). Mera Dep. (R.27-3) at 91, JA100; 1st Mera Aff. (R.27-3) at 2, JA59. At all relevant times, Mera's first-level supervisor was Associate Director Darlene Johnson. Compl. ¶¶ 10-11 (R.2), JA6-7. Her second-level supervisor was Deputy Director for Grant Development and Management Nadine Neufville. Neufville Dep. (R.27-3) at 7, JA118.

By the time of the events at issue, Mera's performance had been on a steady decline for about a decade. While Mera once consistently earned "Outstanding" and "Excellent" ratings (the best and second-best ratings), she earned "Successful" ratings (just above "Unacceptable") on her 2015-16 and 2016-17 appraisals for all three critical elements: Communication and Customer Service, Accountability for Organizational Results, and Fiscal Responsibility/Taxpayer Value. *See, e.g.*, 2007 Appraisal (R.27-3), JA149 (Excellent overall); 2007-08 Appraisal (R.27-3), JA158-67

(Outstanding in all elements); 2010 Appraisal, (R.27-3), JA170 (Excellent overall); 2011-12 Appraisal (R.27-3), JA186 (Excellent in all elements); 2012 Appraisal (R.27-4), JA198-99 (Excellent overall); 2012-13 Appraisal (R.27-4), JA211 (Successful overall); 2015-16 Appraisal (R.27-4), JA222 (Successful in all elements); 2016-17 Appraisal (R.27-4), JA235 (same).

Over the same period, Mera's disability rating increased from thirty percent to one hundred percent. 1st Mera Aff. (R.27-6) at 5, JA62. Since December 2017, the Department of Veterans Affairs has rated Mera as one hundred percent disabled. *Id.*; Mera Dep. (R.27-3) at 45, JA97.

## I. **Mera Misuses Her Government Credit Card for Nine Years**

In July 2017, Mera failed to pay the balance on her government-issued credit card. Proposed Suspension (R.27-4) at 2, JA251. An audit of Mera's account revealed that since 2008, she had used the card to make at least 141 unauthorized personal transactions—such as for food, hotels, and cash advances—amounting to at least $19,329.57 in unauthorized expenditures. *Id.* at 2, 10; Mera Dep. (R.27-3) at 219, 227, JA107, 110. Mera knew at the time that she was supposed to use the card only for official expenses. Mera Dep. (R.27-3) at 219, JA107. Yet though she later claimed, under penalty of perjury, that she had "never received adequate

training on use of the card," Mera Decl. (R.27-4) ¶ 5, JA262, she had in fact completed at least two trainings on proper use of the card—one in 2008, another on December 20, 2016—yet even after the second training, she made another $533 in unauthorized personal transactions. Proposed Suspension (R.27-4) at 10, JA259; Mera Dep. (R.27-3) at 225-26, JA108-09. Separately, she claimed that she had mistaken the travel card for her personal card each time that she used it. Mera Decl. (R.27-4) ¶ 4, JA262.

On April 23, 2018, Mera's first-line supervisor Johnson proposed a fourteen-day suspension due to her misuse of the credit card. Proposed Suspension (R.27-4) at 1, JA250. Mera did not dispute that the charges that the Office had identified as improper were inappropriate. Response (R.27-4), JA264; Mera Decl. (R.27-4), JA262. She instead claimed the charges had been a mistake, and that the proposed suspension was really "a form of retaliation against [her]." Mera Decl. (R.27-4) ¶ 6, JA262.

Mera's second-line supervisor Neufville ultimately imposed a ten-day suspension. Decision (R.27-4) at 1, JA268. Neufville determined that Mera's claim that her improper credit card charges had been a mistake lacked credibility. *Id.* at 2. Neufville noted that Mera had received and paid at least fifty billing statements without ever reporting the card lost

or stolen, or even removing it from her wallet, which Neufville regarded as an admission of responsibility. *Id.* Neufville also noted that Mera had stopped making improper charges for two months after her December 2016 training, then resumed doing so, which suggested intent. *Id.* at 3.

## II.   <u>Mera's Accommodation Record</u>

Mera responded to her suspension by filing an Equal Employment Opportunity ("EEO") complaint against the Office, alleging a hostile work environment based on disability and retaliation. Settlement Agreement (R.27-4) at 1, JA292. The parties entered into mediation and settled the claims. *Id.* The Office agreed to reduce Mera's suspension to five days and provide her certain disability accommodations, which the Department memorialized in an accommodation record dated July 2018. *Id.* ¶¶ 1-2; Mera Email (R.27-4), JA297; Orig. Record (R.27-4), JA301. On August 8, 2018, Mera asserted to the Department that the accommodation record did not fully reflect the terms upon which the parties had agreed during mediation. Mera Email (R.27-4), JA297. The parties executed a revised accommodation record in October 2018. Rev'd Record (R.27-4), JA304.

### III.  Mera's 2016-17 Appraisal

While Johnson was deciding how best to address Mera's credit card misuse, Human Resources staff advised her to not issue Mera's 2016-17 performance appraisal until the matter was resolved, to avoid conflating the separate issues of Mera's misconduct and performance. Johnson Aff. (R.27-5) at 22, JA328; 1st Johnson Dep. (R.27-3) at 85-86, JA112-13; 2d Johnson Dep. (R.27-5) at 38-39, 63, JA343-45; Neufville Aff. (R.27-5) at 31-32, 40-41, JA380-81, 389-90; Neufville Dep. (R.27-3) at 98-99, JA130-31; Email (R.27-5), JA393 ("It is my goal to create some separation between the conduct and performance issues—I'm in the midst of working on a 5-day suspension memo which will be coming your way").

On May 2, 2018, eight days after Johnson had proposed suspending Mera, she signed Mera's 2016-17 performance appraisal, and Neufville signed it the next day. 2016-17 Appraisal (R.27-4) at 2, JA236. Their signing was delayed by Mera's refusal to sign the appraisal. *Id.*; Johnson Aff. (R.27-5) at 22, JA328; Neufville Aff. (R.27-5) at 31-34, 40, JA380-83, 389; Neufville Dep. (R.27-3) at 100, 121, 201, JA132, 134-35. Johnson initially planned to rate Mera as "Unacceptable," but hoping to "wipe the slate clean" and encourage a fresh start, she ultimately rated Mera as

"Successful" in each element. 2016-17 Appraisal (R.27-4) at 1, JA235; 2d Johnson Dep. (R.27-4) at 64-66; Johnson Email (R.27-5), JA394.

## IV.  Mera's 2017-18 Midterm Review

Johnson's delay in issuing Mera's 2016-17 appraisal while deciding how best to address Mera's misuse of her credit card set Mera's appraisal cycle off by approximately seven months. Neufville Aff. (R.27-5) at 31-32, JA380-81; Johnson Aff. (R.27-5) at 24, JA330. As such, Mera's midterm review for the 2017-18 appraisal cycle occurred on November 20, 2018. Neufville Aff. (R.27-5) at 31-32, JA380-81; Johnson Aff. (R.27-5) at 9, JA315; 1st Mera. Aff. (R.27-3) at 11, JA68; Compl. (R.2) ¶ 10(5), JA15. Ahead of Mera's midterm review, Johnson prepared notes that detailed the issues with Mera's performance. Johnson's Notes (R.27-5), JA411-12.

Johnson informed Mera that her work quality had deteriorated and that she was not following up on tasks or communicating with grantees, or otherwise "meeting the work elements that were critical to [her] job." 1st Mera Aff. (R.27-3) at 11, JA68. Johnson "went through a snapshot of [her] work up until that time," advising her how to "end the performance period . . . on a high note" and "get back on track." Johnson Aff. (R.27-5) at 9, JA315. This was a "normal supervisory exchange with an employee;"

Johnson usually offered constructive criticism in midterm reviews to help employees improve their performances, *id.*, and wanted Mera to receive a good rating, Neufville Dep. (R.27-3) at 53, JA121.

Indeed, to boost Mera's performance rating, Johnson tried to assign Mera projects that she thought Mera could perform adequately. Neufville Aff. (R.27-5) at 33, JA382; 2d Johnson Dep. (R.27-5) at 66, JA348. For example, Johnson assigned Mera to work on grant closeouts to help her improve her rating, but Neufville ultimately needed to remove Mera from this project after another supervisor complained that the closeouts "were all being done incorrectly." Neufville Dep. (R.27-3) at 50-51, JA119-20.

## V.   Mera's Unacceptable 2017-18 Performance Appraisal

On May 16, 2019, Johnson signed Mera's 2017-18 appraisal. 2017-18 Appraisal (R.27-5) at 2, JA537. Neufville signed it the next day. *Id.* Johnson rated Mera's work "Unacceptable" in all three critical elements. *Id.* at 1. As to the first critical element, "Communication and Customer Service," Johnson wrote that Mera had "met some of the criteria but did not meet others." *Id.* at 2. Specifically, Johnson wrote, Mera needed to "decrease the level of guidance she needs to respond to routine inquiries by carefully reviewing" the relevant Unit guidance, "demonstrate sound

judgment in responding to grantees," and "maintain her responsiveness to internal and external inquiries while working, including teleworking." *Id.* Johnson wrote that "[a]s a veteran GS-13 program specialist in [the Office] for more than 10 years, more than 5 of those spent working in the Campus Program specifically, Ms. Mera should need very little guidance when responding to most grantee inquiries." *Id.* Finally, Johnson wrote, Mera "must demonstrate a higher level of expertise in program policy and grant program administration processes such that her work product would require minimal correction from her colleagues and/or supervisor," and also demonstrate "[s]ound judgment" regarding when it is or is not appropriate or necessary "to involve her supervisor and/or other [Office] leadership in emails in responding to inquiries from her grantees." *Id.*

As to the second element, "Accountability for Organizational Results," Johnson wrote that Mera again "met some of the performance criteria but failed to meet others." 2017-18 Appraisal (R.27-5) at 3, JA539. Specifically, Mera "required considerable routine guidance from her supervisor and colleagues" in serving "as the point of contact for two important grant cycle processes" and sometimes "failed to participate and/or provide much needed input in the internal and external review of

program process documents, such as the campus peer review scoring forms." *Id.* From time to time, she wrote, Mera "did not address required edits recommended by reviewers to program process documents." *Id.*

As to the third element, "Fiscal Responsibility/Taxpayer Value," Johnson wrote that Mera again "met some of the performance criteria but failed to meet others." 2017-18 Appraisal (R.27-5) at 3, JA539. Specifically, she wrote, Mera "failed to demonstrate routine proficiency in processing grant award packages consistent with office policy and guidance," and "did not demonstrate the level of proficiency one would expect from an experienced program specialist with more than 10 years in [the Office]." *Id.* Johnson wrote this was "particularly true with the writing of Grant Managers Memoranda [ ] and generating Redbooks (Award documents) that accurately reflect approved project activities." *Id.* Mera's Redbooks, Johnson wrote, "should require minimal editing by reviewers for grammar and consistency with program statutory scope." *Id.* Further, "each [Grant Manager Memorandum that] Ms. Mera drafted should have been customized to reflect the specific project activities to be funded and not simply reflect standard or non-relevant information." *Id.*

## VI.  Mera's Placement on a Performance Improvement Plan

If a Department employee receives an unacceptable performance appraisal, her supervisor must place her on a Performance Improvement Plan (a "Plan") to provide her an opportunity to improve her performance before making a final personnel decision. Monteagudo Aff. (R.27-5) at 5, JA400; 5 C.F.R. § 432.104. Consistent with this policy, on August 13, 2019, Johnson placed Mera on a sixty-day Plan due to her "Unacceptable" appraisal. Plan (R.27-5), JA551; Johnson Aff. (R.27-5) at 25, JA331; Neufville Aff. (R.27-5) at 35, JA384; Supp. Johnson Aff. (R.27-5) at 2, JA566. The Plan explained how Mera's performance was unacceptable across all three critical elements, and what she must to do to improve:

### A.  Communication and Customer Service

**Grantee Inquiries:** You routinely forward grantee inquiries to me and/or co-workers to answer requests for information without first attempting to answer or resolve the grantee's issue yourself. For example, you forwarded an email on May 15, 2019, from a grantee who contacted you to see how she should proceed because she had a conflict with the date of the Project Coordinator Call. You did not make any attempt to answer the grantee's inquiry, instead you forwarded the email to the team for a response.

**Team Communication:** You routinely fail to provide sufficient and relevant feedback and input to resolve an identified problem or make a decision during email discussions in response to matters raised by team members.

For example, often during our weekly unit meetings, you fail to contribute, even when directly asked your opinion on a matter. When you do contribute, it is often negative. For example on July 11, 2019, you criticized your colleague's attempt to develop a useful tool for grantees to capture campus statutory and program requirements. However, when asked if you had any ideas, you failed to offer anything until I specifically asked you for an idea, and then your response did not add any value to finalizing the tool.

**Works Successfully with Unit Members to Complete Joint Projects:** You were tasked as the unit's point of contact with the oversight of the programmatic review process to assess whether the application adequately addressed the scope of the program, contained any activities that compromises victim safety and included any unallowable activities. On May 17, 2019, you engaged in a series of emails where you failed to clearly explain what issues/errors needed to be addressed, despite your colleagues['] numerous requests for additional clarity and information. In an attempt to resolve the issue, I suggested that you telephone staff to discuss what was needed to complete this task. However, you failed to follow through on my suggestion.

**Team Participation/Joint Projects:** You failed to fully participate in peer review along with your assigned team. For example, on March 1, 2019, you informed me that you would be present for both the Campus and Consolidated Youth (CY) peer reviews held in April 2019. However, you failed to attend the last day of both the Campus and CY peer reviews or monitor the consensus meeting. As you know, the last day is one of the busiest days of peer review involving critical consensus panel meetings. Due to your absence, the unit was forced to solicit assistance from staff outside of the unit, and unfamiliar with the program, to cover peer review on both of the Fridays you failed to show.

**Act Independently:** You routinely ask me and/or co-workers basic information that you should already know. This was evident on February 25, 2019, when you sent an email to a unit member asking which past grantees can/should apply to the upcoming solicitation. This is basic information that you should have reasonably known or been able to find on your own, as a veteran grant program specialist. Questions like this take away critical time that I and your colleagues need to do our own work.

Plan (R.27-5) at 4-5, JA554-55. Success at this element required completing four tasks, including:

1. You must research and formulate technically correct responses to inquiries without relying on co-workers or supervisors. Elevating routine inquiries to co-workers or supervisor more than 2 times during the duration of this [Plan], without first attempting to research and formulate technically correct responses, will constitute a failure to meet this task. You will demonstrate to me in our weekly meeting what research was done in your responses to inquiries prior to your elevating the inquiry to co-workers or me.

2. You must fully participate with unit members by facilitating an assigned section of the agenda during the planned Project Coordinators Call in September; failure to facilitate your assigned section of the agenda during the Project Coordinators Call will constitute a failure of this task. This task will require your participation in the Project Coordinator Call in September. If you are on approved sick leave on the day of this meeting, I will provide you with an alternate task. If you miss the meeting but are not on approved leave, this will constitute a failure of this task.

Plan (R.27-5) at 5, JA555.

**B.    Accountability for Organizational Results**

**Develop BMR Form:** As the [Basic Minimum Requirements ("BMR")] point of contact, you failed to incorporate the unit's initial feedback in order to produce a final BMR document. Additionally, on or about February 19, 2019, the draft form that you routed to team members did not reflect changes included in the FY 2019 Camps Program solicitation.

**Peer Review Forms:** You have failed to provide initial edits or comments that reflect your feedback to the draft peer review scoring forms. Your initial response to the peer review point of contact on March 27, 2019, advised her that, "I said I did not have any comments. Some of mine duplicated Darlene's." This response caused confusion since I had not provided any comments/feedback at that time. Once the peer review point of contact brought this to your attention, you submitted minimal comments to the peer review forms.

**Programmatic Review Form:** As the Programmatic Review point of contact, you experienced challenges with consolidating team feedback on the draft form. This resulted in confusion and on or about April 16, 2019, time was wasted sending emails back and forth regarding the missing edits. As a result, the unit's team lead intervened and made all of the suggested changes, incorporating input from your colleagues, and her version became the final programmatic review form.

Plan (R.27-5) at 7, JA557. Success at this element required completing

three tasks, including:

1. You must generate your assigned Redbooks in accordance with [Office] policy and procedures. All Redbooks must contain accurate and complete information. Any one Redbook that contains more than three errors, including but not limited to incorrect budget code, corrections to the salutation, authorizing

official, and/or have missing fields, will constitute failure of this task. . . .

3. You must fully participate in the development of the unit's program plan by providing feedback and input that reflects gaps in application submission, issues raised by grantees, and/or priorities previously identified by the team for management review and approval. Failure to actively engage in discussions with unit members and/or offer solutions to the unit's program plan will constitute a failure of this task.

Plan (R.27-5) at 7-8, JA557-58.

## C.  Fiscal Responsibility/Taxpayer Value

**Monitoring Report:** You failed to demonstrate the knowledge necessary for monitoring grantee compliance in accordance with the [Office's] Monitoring Manual and subsequent guidance provided by [the Office]. Up until recently, your monitoring reports: 1) did not reflect who from the grantee's staff and partner staff you talked to and when, 2) failed to provide details on whether the grantee is making progress in project implementation, 3) did not include your analysis of whether the grantee is in compliance with statutory and programmatic requirements, and 4) were not written based on phone interviews or discussions.

**Report Submission:** You failed to upload the complete and accurate monitoring package into [the Grant Management System (the "System")] in accordance with the [Office's] Monitoring Manual. This was emphasized in our recent email exchange on April 4-5, 2019, which demonstrated that you do not have an understanding on how to properly submit monitoring reports and relevant documentation in [the System] for my review and approval.

**Award Making/Budget Reviews:** You failed to conduct a programmatic analysis on your budget reviews to determine

if the budgetary items were within scope of the program. This was demonstrated in your budget tracking forms submitted to Grants Financial Management Division, with errors falling into two categories: 1) budget tracking forms that needed additional programmatic changes; and 2) budget reviews where you were required to go back to the grantee for additional information. These errors were outlined in my email to you dated November 20, 2019, wherein I stated that you needed to address the identified concerns.

Plan (R.27-5) at 9-10, JA559-60. Success at this element required completing six tasks, including:

3. You must complete your monitoring requirement by conducting two monitoring reviews, which includes one on-site visit to a local grantee and one office-based review. Failure to complete the two reviews will constitute a failure of this task.

4. You must upload and submit the final monitoring reports into [the System] by the program division deadline of September 30, 2019. Failure to upload and submit the final monitoring reports into [the System] by September 30, 2019, will constitute a failure of this task.

5. You must conduct a thorough program analysis of your assigned FY 2019 budgets. This analysis must support the scope of the program and should not contain programmatic discrepancies. Your failure to conduct a program analysis of your assigned FY 2019 budgets, will constitute a failure of this task. Additionally, if the analysis is returned with more than 3 errors per budget from the Grants Financial Management Division [ ], this will constitute a failure of this task.

Plan (R.27-5) at 10, JA560.

## VII. **Mera's Proposed Removal**

During the sixty-day Plan period, Johnson kept detailed notes on Mera's performance. Plan Notes (R.27-6), JA569. She met with Mera each week to discuss her progress and address questions. Proposed Removal (R.27-6) at 2, JA596. She also extended the Plan by over three weeks so Mera could finish two budgets. *Id.* at 1. Yet Mera's performance did not improve, so on November 19, 2019, Johnson proposed her removal. *Id.*

In a detailed eighteen-page memorandum, Johnson described the numerous deficiencies in Mera's performance across all three critical elements of the Plan. Proposed Removal (R.27-6) at 1, JA595. Mera's work product, she wrote, frequently "contained mistakes and omissions that required extensive editing or had to be returned more than twice," while "[s]ome tasks were not completed in their entirety and lacked the technical analysis needed to adequately complete the task." *Id.* at 16. Johnson also wrote that Mera "failed to take responsibility for tasks that were clearly within [her] purview" and "attempted to reroute [her] work to other unit members." *Id.* Overall, Johnson wrote, "[t]he quality" of Mera's work was "not representative of a GS-13 program specialist." *Id.*

## A. First Critical Element: Communication and Customer Service

### 1. Task 1: Formulating Technically Correct Answers

Mera "asked routine questions that [she] should have reasonably known the answer to" on numerous occasions, "without first researching the matter." Proposed Removal (R.27-6) at 4, JA598. Mera also proposed referring a grantee for technical assistance on "a routine question" that the Unit already had "answered many times" such that Mera should have answered it herself. *Id.* at 5. She also drafted a program plan that "lacked the basic responses to the routine inquiries in the program plan template, which reflected that [she] had failed to do research on several items." *Id.*

### 2. Task 2: Facilitation of the Project Coordinators Call

Johnson and other Unit employees had made "several attempts" to ask Mera which part of the Project Coordinators Call she would lead, but Mera "failed to respond to these inquiries." Proposed Removal (R.27-6) at 6, JA600. Mera did not ask which part of the call she should lead until the day of the call itself, "at [which] point it was too late." *Id.* at 6. Mera ultimately did not facilitate any part of the call. *Id.*

**B.    Second Critical Element: Accountability for Organizational Results**

    1.   <u>Task 2: Award Package (Redbooking)</u>

Twelve of the thirteen Redbooks that Mera was assigned to process, Johnson wrote, were inadequate. Proposed Removal (R.27-6) at 9, JA603. Four of Mera's Redbooks "were sent back by reviewers, at least one of which contained more than three errors," Johnson wrote, while eight of them "were returned between two and five times due to multiple errors and omissions, including inaccuracies in the project description and incorrect address, salutation, special condition, award amount, or award type . . . all of which are critical pieces of information that must be correct in all award documents." *Id.* Johnson often had to send the same Redbook back to Mera for revisions several times, before finally making the changes herself when Mera failed to make them. *Id.* Mera also failed to proofread her work to avoid repeating mistakes and errors. *Id.*

    2.   <u>Task 4: Program Plan</u>

Johnson wrote that Mera's initial draft of the Campus Program Plan, which she had been assigned to write, "raised questions about basic programmatic information that [she] should have already known and/or that was readily available to" her. Proposed Removal (R.27-6) at 10,

JA604. Although Mera discussed changes to the Plan with other staff, she did not incorporate them into the draft. *Id.* As the draft was revised, Mera "did not compile the necessary edits during each level of review and move the plan forward for approval, as was required of [her] as the point of contact." *Id.* Mera's comments, which she did not offer until "several rounds of review were already completed," also "lacked substance." *Id.*

## C. Third Critical Element: Fiscal Responsibility /Taxpayer Value

### 1. Task 2: Monitoring Visit

Mera did not conduct her scheduled on-site visit to a local grantee, Loyola University, claiming that she had a medical emergency, which Johnson did not count against her. Proposed Removal (R.27-6) at 13, JA607. But Mera then missed several follow-up conference calls with the grantee. *Id.* After Mera missed one such call, which she had scheduled in advance, Johnson reminded her about two more calls later that day, but Mera missed those calls, too. *Id.* at 14. She joined other calls, but refused to submit any notes from them, asserting that she did not need to submit her notes even after Johnson asked her to do so. *Id.* Mera also refused to debrief her Team Lead or technical assistance provider after the calls. *Id.*

### 2. Task 4: Budgets

Johnson wrote that twelve of the thirteen budgets that Mera filed had many "unidentified programmatic costs." Proposed Removal (R.27-6) at 14, JA608. Seven of Mera's budgets "contained significant unallowable and/or questionable costs," while five "lacked a thorough programmatic analysis." *Id.*; Budgets Emails (R.27-6), JA615.

### 3. Task 5: Progress Review Reports

Johnson examined six of Mera's progress review reports and found that they all had "questionable data elements" or "out-of-scope" activities. Proposed Removal (R.27-6) at 16, JA610; Reports Emails (R.27-6), JA623.

## VIII. **Mera's Removal**

Mera submitted both written and oral replies to Johnson's removal proposal. Written Reply (R.27-6), JA633; Oral Reply (R.27-6), JA643. By and large, she did not deny Johnson's factual account of her performance, instead mostly downplaying or making excuses for the deficiencies in her work. *Id.* The Office designated Deputy Director for Policy, Outreach, and Communications Mary Powers, who had no supervisory relationship with Mera, sat outside Mera's chain of command, and otherwise played no role in the events leading up to the removal proposal, to serve as the deciding official for the removal decision. Powers Aff. (R.27-6) at 1-3, JA652-54.

On March 25, 2020, Powers issued a twelve-page memorandum sustaining Johnson's removal proposal and removing Mera from federal service. Decision (R.27-6), JA662. Powers set out a detailed account of the numerous deficiencies in Mera's Plan performance, finding that Mera failed to perform at an adequate level seven of the thirteen tasks across all three critical elements. *Id.* Powers found that Mera "depended on team members and Ms. Johnson to help [her] handle routine matters and questions that a GS-13 program specialist with [her] length of experience should be able to address on her own, and [that] Ms. Johnson had to step in multiple times to complete [her] work." *Id.* at 9. Powers stressed Mera's "more than 16 years of experience," "the impact of [her] performance on other employees in the Office and the grantees," "the importance of [her] work to the functioning of the Office, [her] supervisor's lack of confidence in [her] ability to perform assigned duties, the clarity with which [she was] provided an opportunity to improve, and the assistance provided to [her] during the Performance Improvement Period." *Id.*

Powers was "not persuaded" that Mera did not understand "the requirements of [her] position or obligations under the [Plan]." Decision (R.27-6) at 9, JA670. Powers likewise found Mera's "assertion that [her]

performance was at the successful level" unconvincing. *Id.* Powers wrote that Mera "clearly did not have a command of [her] area of responsibility with regard to the duties and responsibilities of [her] position as Grant Program Specialist," and that her previous successful ratings only proved that she knew "what bar [she] must meet for successful performance." *Id.*

Last, Powers addressed and rebutted the various excuses that Mera offered for the defects in her performance in her oral and written replies.

## A. First Critical Element: Communication and Customer Service

### 1. Task 1: Formulating Technically Correct Answers

Mera argued that she had in fact known all the answers to grantees' questions without needing to ask Johnson, but had chosen to ask Johnson anyway because she thought that she had to check with Johnson before responding to any grantee inquiries. Written Reply (R.27-6) at 5, JA637. Powers found that this excuse was not credible, explaining that the Plan specifically required Mera "to research and formulate technically correct responses . . . without relying on co-workers or supervisors." Decision (R.27-6) at 3, JA664; Plan (R.27-5) at 5, JA555. Powers also noted that on at least one occasion, Mera proposed referring a grantee elsewhere for technical assistance on its question, even though the grantee had asked

a "simple" question that Mera "should have been able to answer on [her] own as an experienced program specialist, without needing to refer it elsewhere for "technical assistance." Decision (R.27-6) at 2, JA663.

## 2. Task 2: Facilitation of the Project Coordinators Call

Powers noted that Johnson asked Mera to "review the Powerpoint and make edits as needed." Decision (R.27-6) at 3, JA664. Powers wrote that Mera instead "advised that the PowerPoint was 'quite wordy, lacks consistency, points out of order, grammar needs checked, and informal voice is used," suggestions that were not "helpful." *Id.* Johnson asked how Mera "proposed [ ] that we address your concerns," but Mera did not respond. *Id.* "On the morning of the call," Johnson "had to follow-up twice to get the necessary edits completed." *Id.* Mera "also suggested that Ms. Johnson look at last year's presentation (which was already being used as the current PowerPoint) and asked for guidance on the needed changes that you had suggested previously for the presentation." *Id.* "Given your length of service," Powers said, "you shoud have followed through on making the edits ahead of the morning of the" call. *Id.* at 3-4.

Powers also wrote that Johnson and others made several attempts "to coordinate which section of the call [Mera] would facilitate." Decision

(R.27-6) at 4, JA665. "This was a key part of your [Plan]," Powers wrote, "and yet I did not receive emails from you showing you tried to organize a topic to discuss. Because of the importance of the call in your [Plan]," Powers wrote, "you should have taken the initiative to figure out which section of the [call] you would be facilitating." *Id.* Powers noted that Mera had "offered to read the bulk of the presentation," but said that "[s]imply reading from a PowerPoint presentation (which is an outline, not a script) is not the same as facilitating a discussion on a topic, and you never did coordinate a particular section to cover during the [call]." *Id.*

## B. Second Critical Element: Accountability for Organizational Results

### 1. Task 2: Award Package (Redbooking)

Mera argued that she had received inadequate training on how to draft Redbooks, claiming that she had been simply "thrown into the job and expected to 'sink or swim.'" Written Reply (R.27-6) at 7, JA639. In response, Powers noted that Mera had Redbook training as recently as May 9, 2019, and perhaps more importantly, had nearly twenty years of experience drafting Redbooks as a grant program specialist, and thus should not have made such basic errors. Decision (R.27-6) at 5, JA666.

2. <u>Task 4: Program Plan</u>

Mera argued that she submitted her draft program plan on time. Written Reply (R.27-6) at 7, JA639. In response, Powers noted that the task "required more than merely providing the draft within the required timeframe." Decision (R.27-6) at 6, JA667. "It required that [Mera] provide meaningful input to the initial plan," which she did not do. *Id.*

## C. Third Critical Element: Fiscal Responsibility /Taxpayer Value

1. <u>Task 2: Monitoring Visit</u>

Mera offered conflicting excuses for failing to participate in follow-up calls with the grantee. In her written reply, Mera claimed that she had thought that her coworker Latinisha Lewis would cover the follow-up grantee calls for her. Written Reply (R.27-6) at 8, JA640. As Powers noted, however, Lewis had made clear to Mera ahead of time that she was not sure that she could join the calls. Decision (R.27-6) at 7-8, JA668-69; Loyola Emails (R.27-6) at 15, JA689. In her oral reply, Mera contradicted herself and claimed she had thought that Johnson would handle the calls. Oral Reply (R.27-6) at 21, JA648. But as Powers noted, Johnson never suggested that she would handle these calls, and indeed, emails showed that Johnson repeatedly reminded Mera to participate in

the calls, including on the very day the calls in question were scheduled. Decision (R.27-6) at 7, JA668; Loyola Emails (R.27-6) at 3-11, JA677-85.

2. Task 4: Budgets

Powers found that "[t]here were seven significant changes and edits needed on your budgets that required further calls with the grantees." Decision (R.27-6) at 8, JA669. "Most of the needed changes appeared to be general questions that a seasoned program specialist should have known to ask grantees," Powers wrote. *Id.* Additionally, Powers found that Mera had "failed to identify multiple problems in these budgets, including missing bases for computation, errors in the mandatory technical assistance allocations, potentially unallowable costs, a potentially excessive consultant rate, and items subject to additional review under the National Environmental Policy Act." *Id.*

3. Task 5: Progress Review Reports

Powers noted that "Johnson found issues that should have been caught by you before they were approved, including possible unallowable activities, missing campus plans to train students who missed previous training days, missing details for meeting programmatic requirements, and the other items identified for the task in the proposal." Decision

(R.27-6) at 9, JA670. "Given your long experience as a program specialist," Powers wrote, "missing these items was unacceptable." *Id.*

## IX. <u>Procedural History</u>

Mera filed this action on August 4, 2020. Dist. Ct. Dkt., JA2. On March 25, 2024, the district court granted the Attorney General summary judgment, concluding that Mera had failed to show a genuine dispute as to whether the Department's reason for removing her—i.e., her unacceptable performance, even after the Department placed her on the Plan—was a pretext for discrimination or retaliation. Order (R.34), JA929; Mem. Op. (R.35) at 34-41, JA963-70. The district court rejected Mera's argument "that her termination must have been [discriminatory and/or] retaliatory because she satisfied the requirements set out in the [Plan]," concluding that such an "unsupported, conclusory assertion is insufficient to show pretext." *Id.* at 35. "The fundamental problem with [Mera's] arguments," the district court explained, "is that, even were she correct that Johnson's criticisms were stylistic and [she] was not afforded any training, she has still offered no evidence that [the] proffered reason for terminating [her]—[her] failure to satisfy the terms of her [Plan]—

which reason is presumptively valid, is pretext for discrimination." *Id.* at 40 (cleaned up). Mera timely filed a notice of appeal. Not. (R.39), JA975.

## SUMMARY OF THE ARGUMENT

Mera fails to show a genuine dispute as to whether Powers' reasons for removing her were pretextual. Mera's only argument as to pretext is that Powers misjudged her satisfactory Plan performance as inadequate, but she adduces no evidence that Powers did not sincerely believe that Mera's performance was poor. While Mera may disagree with Powers' evaluation of her, she provides no evidence that Powers' assessment was insincere, as is required to show a genuine dispute as to pretext.

## STANDARD OF REVIEW

"This [C]ourt reviews the grant of summary judgment de novo." *Bastani v. Am. Fed'n of Gov't Emps.*, 70 F.4th 563, 566 (D.C. Cir. 2023). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

# ARGUMENT

Mera fails to show a genuine dispute as to whether Powers' reasons for removing her were pretextual.[1] Mera's only argument as to pretext is that Powers misjudged Mera's satisfactory performance as inadequate, but Mera offers no evidence that Powers did not honestly believe that her performance was poor. Mera may feel that Powers misjudged her, but she

---

[1] Mera's opening brief does not appear to challenge her performance appraisal as discriminatory or retaliatory, and thus forfeits any such arguments. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief."). Had she raised such arguments, they would fail. Johnson gave detailed legitimate explanations for rating Mera's performance as "unacceptable" in all three critical elements, *see* 2017-18 Appraisal (R.27-5), JA000, and Mera does not argue that Johnson's explanations were pretextual, *see* Br. at 41-47, thus forfeiting such an argument, *see Al-Tamimi*, 916 F.3d at 6.

Mera arguably lists various other issues in her statement of issues as well, *see* Br. at 1-2, but "[s]imply listing the issues on review without briefing them does not preserve them." *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 861 (D.C. Cir. 2015) (quoting *Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996)); *accord Hosp. Menonita De Guayama, Inc. v. Nat'l Lab. Rels. Bd.*, 94 F.4th 1, 16 (D.C. Cir. 2024) ("Petitioner also lists several issues in its brief without adequately amplifying its claims. These are matters that we do not consider."); *Katopothis v. Windsor-Mount Joy Mut. Ins. Co.*, 897 F.3d 291, 298 (D.C. Cir. 2018) ("Such cursory treatment of the issue is not adequate to raise it for review.").

offers no evidence that Powers' assessment was insincere, much less that Powers was really motivated by unlawful discrimination or retaliation.

At the summary judgment stage, courts analyze Rehabilitation Act discrimination and retaliation claims based on circumstantial evidence using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kersey v. Wash. Metro. Area Trans. Auth.*, 586 F.3d 13, 16 (D.C. Cir. 2009). A plaintiff bears the initial burden to establish a prima facie case of discrimination or retaliation. *Id.* at 17. The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory or non-retaliatory reason for the challenged action. *Id.* This burden is one of production, not persuasion—the employer need only "articulate" a reason for its action, not "come forward with affirmative evidence showing its action was not discriminatory" and/or retaliatory. *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26, 29 (D.C. Cir. 1997).

Once the employer satisfies this burden, the burden shifts back to the plaintiff to try to show that the employer's proffered explanation is a mere pretext for discrimination or retaliation. *See Kersey*, 586 F.3d at 17. "While timing can establish a prima facie case of retaliation, dislodging an employer's [stated nondiscriminatory or] nonretaliatory explanation

as pretextual at the third step of *McDonnell Douglas* requires 'positive evidence beyond mere proximity.'" *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) (quoting *Minter v. Dist. of Columbia*, 809 F.3d 66, 71-72 (D.C. Cir. 2015)); *accord Jeffries v. Barr*, 965 F.3d 843, 862 (D.C. Cir. 2020) ("temporal proximity alone is insufficient to establish pretext"); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine."). In considering whether a genuine dispute exists on whether a proffered explanation is pretextual, courts "do not serve as super-personnel departments that reexamine whether such a decision was wise, sound, or fair." *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 7 (D.C. Cir. 2015) (cleaned up).

When a "defendant proffers a nondiscriminatory and nonretaliatory rationale, it is unnecessary to consider whether the plaintiff actually made out the elements of a prima facie case." *Kersey*, 586 F.3d at 17 n.2. If "a defendant has proffered a nondiscriminatory and nonretaliatory explanation, it has done everything that would be required of it if the plaintiff had properly made out a prima facie case." *Id.* (cleaned up). "At that point, whether the plaintiff really did so is no longer relevant, and

the only question is whether the defendant intentionally discriminated against the plaintiff." *Id.* (quotation marks omitted). Accordingly, once the employer proffers a legitimate, non-discriminatory or non-retaliatory explanation for the challenged action, the "court need not—and should not—decide whether the plaintiff actually made out a prima facie case," but should instead ask whether the employer's stated reason for its action is a pretext for unlawful discrimination or retaliation. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).

The Plan specified that Mera had to satisfy every task associated with a critical performance element to achieve success on that element. Plan (R.27-5) at 5, 7, 10, JA555, 557, 560. As such, a finding that Mera failed to satisfy a single task supported a finding that she did not achieve success as to the associated critical performance element. *See DeJesus v. WP Co.*, 841 F.3d 527, 533 (D.C. Cir. 2016) (if "an employer offers several independent reasons for the challenged action, [then] the employee must cast doubt on each reason to overcome summary judgment"); *Hartzler v. Mayorkas*, No. 22-5310, 2024 WL 3219489, at *4 (D.C. Cir. June 28, 2024) ("Because the [Plan] was clear that failure of one of the core competencies afforded grounds for removal . . . either failure" alone supported removal,

so if "no reasonable jury could find that [supervisor] did not honestly and reasonably believe the reasons that [plaintiff] failed the [Plan] as to [one element] we need not consider the reasons given for failure as to [other]").

In a detailed, twelve-page memorandum, Powers found that Mera failed seven of the Plan's thirteen required tasks across all three critical performance elements: (1) "Formulating Technically Correct Responses," (2) "Facilitation of the Project Coordinators Call," (3) "Award Package (Redbooking)," (4) "Program Plan," (5) "Monitoring Visit," (6) "Budgets," and (7) "Progress Reports." Decision (R.27-6) at 2-9, JA663-70. Powers found that Mera often did not finish, or even perform, her assigned tasks —and when she did, her work frequently contained serious omissions, errors, and analytical shortcomings that a Grant Program Specialist with sixteen years of experience in the Office should not have made, and which Johnson and her colleagues often would need to correct. *See generally id.*

Mera's performance remained unacceptable, Powers found, even as Johnson tried to help her throughout the Plan process. Johnson met with Mera each week to review her progress and answer her questions, even extending the Plan by weeks so that Mera could finish her projects, giving her one more chance to succeed. Proposed Removal (R.27-6) at 1, JA595.

Yet despite this help, Mera still failed to perform basic aspects of her job capably. *Id.* Powers rejected Mera's excuses for her performance, writing that Mera "clearly did not have a command of [her] area of responsibility with regard to the duties and responsibilities of [her] position." *Id.* at 9.

Mera fails to create a genuine issue as to whether Powers' proffered reasons for removing her were pretextual. Mera's only argument as to why Powers' reasons supposedly are pretextual is that Powers misjudged her adequate performance as poor. In essence, Mera "trie[s] to undermine [Powers'] explanation by contending that" Powers "should have been . . . satisfied with [her] performance. That argument is simply not tenable." *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).

That is so because "the key question" when it comes to pretext 'is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). As such, "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). For that reason, "it is the perception

of the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel*, 627 F.3d at 1247. "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, [ ] there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts. *Brady*, 520 F.3d at 495. This means that Mera "cannot survive summary judgment merely by asserting that [Powers] made a bad decision. Rather, she must raise a genuine dispute over [Powers'] honest belief in [Powers'] proffered explanation." *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016).

That, Mera does not do. Mera "points to nothing other than her own opinion of her performance to dispute [Powers'] evaluation" of her, which "is inadequate by itself to create an issue for the jury" as to the sincerity of Powers' reasons. *Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015). "Even if [Powers] incorrectly assessed" her work, Mera "must still present evidence casting doubt on the sincerity of [Powers'] proffered [legitimate] justification for [the removal] action." *Solomon v. Vilsack*, 763 F.3d 1, 17 (D.C. Cir. 2014); *accord Desmond v. Mukasey*, 530 F.3d 944, 963-64 (D.C. Cir. 2008) ("it will not do for the plaintiff to" challenge an "employer's stated reason . . . if the employer believed it in good faith");

*see also Hartzler*, 2024 WL 3219489, at *4 ("Because [employee] has failed to raise a genuine issue of material fact as to [her supervisor's] honest and reasonable beliefs in the reasons given for her [Plan] placement, we affirm the district court's grant of summary judgment").

Mera quibbles with numerous aspects of Powers' assessment of her, but adduces no reason to doubt that Powers herself "honestly believe[d]" that Mera's performance was poor. *Hairston*, 773 F.3d at 273. Simply put, she "proffers nothing that calls into question the genuineness of [Powers'] belief" that her performance was inadequate. *Id.* "In response to [Powers'] explanations, [Mera] offers only conclusory statements, . . . from which no reasonable jury could make the desired inference that [Powers' stated] justifications were mere pretext, or that [an invidious] reason more likely motivated [her] actions." *Solomon*, 763 F.3d at 17 (cleaned up).

Indeed, Mera acknowledges that at times her work was lacking. But she insists that "notwithstanding [her] failings, the Department should not have terminated [her] because there were extenuating circumstances and . . . some positive attributes to [her] performance"—an argument that this Court repeatedly has rejected. *McGrath v. Clinton*, 666 F.3d 1377, 1384 (D.C. Cir. 2012) (quoting *Waterhouse v. District of Columbia*, 298

F.3d 989, 995 (D.C. Cir. 2002) (cleaned up)); *see also Woodruff v. Peters*, 482 F.3d 521, 531 (D.C. Cir. 2007) ("[Plaintiff] argues he could do his job despite the shortcomings [employer] cited, but does not present evidence from which the finder of fact could infer [that employer] agreed. This is insufficient"); *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 146 (D.C. Cir. 2008) (employer's "stated belief about [plaintiff's] performance deficiencies was reasonable" where the plaintiff himself did "not dispute some of the [employer's] stated reasons for his termination").

Last, Mera insists that there are facts in dispute precluding a grant of summary judgment, *see* Br. at 43, but this argument falls flat. That is because "[e]ven if the finder of fact were to credit all of [Mera's] evidence, there would be no basis for rejecting the presumptive validity of [Powers'] explanation." *Woodruff*, 482 F.3d at 531. In other words, even taking all the facts as Mera describes them, they do not undermine Powers' reasons for removing her, much less suggest that Powers' reasons were insincere. For all these reasons, viewing the evidence in the light most favorable to Mera, Mera fails to create a genuine dispute as to pretext. As such, this Court should affirm the district court's grant of summary judgment.

## A.    Formulating Technically Correct Answers

This task required that Mera

> research and formulate technically correct responses to inquiries without relying on co-workers or supervisors. Elevating routine inquiries to co-workers or supervisors more than 2 times during the duration of this [Plan], without first attempting to research and formulate technically correct responses, will constitute a failure to meet this task. You will demonstrate to me in our weekly meetings what research was done in your responses to inquiries prior to your elevating the inquiry to co-workers or me.

Plan (R.27-5) at 5, JA555.

In concluding that Mera failed this task, Powers found that Mera had "elevated at least two routine inquiries to [her] supervisor without attempting to research and formulate technically correct responses" on her own. Decision (R.27-6) at 2, JA663. One time, Powers wrote, Mera "unnecessarily asked Ms. Johnson for guidance" about a "simple" matter that she "should have been able to answer on [her] own as an experienced program specialist." *Id.* Another time, Powers wrote, Mera "elevated" to Johnson an inquiry that she "should understand" and "have been able to answer [ ] on [her] own." *Id.* Mera also often elevated "routine inquiries regarding development of the Campus Program Plan," Powers found. *Id.*

Mera disputes none of this. She instead argues "that she was aware of the correct responses but kept Johnson informed of these inquiries because Johnson had directed her to do so," Br. at 42, but even if so, it is immaterial. Powers duly considered this excuse, but reasonably found it to be not credible because keeping Johnson "informed," *id.*, about grantee inquiries did not mean, or require, asking Johnson basic questions about routine matters that she should have been able to resolve herself. Powers wrote that Mera often would ask Johnson "basic programmatic questions that [a] Program Specialist should be able to answer and should not need to be elevated to Ms. Johnson." Decision (R.27-6) at 3, JA664. As Powers noted, the task explicitly required that Mera "research and formulate technically correct responses . . . without relying on co-workers or supervisors." *Id.* (cleaned up); Plan (R.27-5) at 5, JA555.

Indeed, the task plainly specified that "[e]levating routine inquiries . . . more than 2 times" would amount to failure. Plan (R.27-5) at 5, JA555. Mera does not dispute that she elevated routine inquiries more than two times. Thus, even if Mera thought that she should keep Johnson informed about grantee inquiries, that creates no genuine dispute about whether Powers' explanation—namely, that on more than two different occasions,

Mera raised routine inquiries that she should have handled on her own—

was pretextual. *See Hairston*, 773 F.3d at 273; *see also Hartzler*, 2024 WL

3219489, at *4 (employee "could fail [an element] only once each month

to stay within bounds of the [Plan]," so "no reasonable jury could find that

[supervisor] did not honestly and reasonably believe [that the employee]

failed the [Plan] based on two instances of failure in" a single month).

### B.    Facilitation of the Project Coordinators Call

This task required that Mera

> fully participate with unit members by facilitating an
> assigned section of the agenda during the planned Project
> Coordinators Call in September. Failure to facilitate your
> assigned section of the agenda during the Project
> Coordinators Call will constitute a failure of this task. This
> task will require your participation in the Project Coordinator
> Call in September. If you are on approved sick leave on the
> day of this meeting, I will provide you with an alternative
> task. If you miss the meeting but are not on approved leave,
> this will constitute a failure of the task.

Plan (R.27-5) at 5, JA555.

In concluding that Mera failed this task, Powers noted that Johnson

had asked Mera to "review [a] PowerPoint and make edits as needed."

Decision (R.27-6) at 3, JA664. "Instead of offering helpful suggestions,"

Powers wrote, Mera "sent Ms. Johnson an email at 11:30 p.m. . . . and

advised that the PowerPoint was 'quite wordy, lacks consistency, points out of order, grammar needs checked, and informal voice is used.'" *Id.*

Mera disputes none of this. She argues that Johnson did not send her the PowerPoint until after business hours, and that she "promptly responded late that same day," Br. at 43, but that is immaterial. Powers faulted Mera for failing to "offer[ ] helpful suggestions," not just for the late hour of her email. Decision (R.27-6) at 3, JA664. Mera also argues that she "offered to present part or all of the PowerPoint Presentation." Br at 43. Even if so, that too is immaterial. Powers found, and Mera does not deny, that Mera merely "offered to read the bulk of the presentation." Decision (R.27-6) at 4, JA665. Powers explained that "[s]imply reading from a PowerPoint presentation (which is an outline, not a script) is not the same as facilitating a discussion on a topic, and [Mera] never did coordinate a particular section to cover during the [call]." *Id.* Mera's own subjective opinion that merely reading from the PowerPoint without ever facilitating a discussion was good enough does not suggest that it was pretextual for Powers to think otherwise. *See Hairston*, 773 F.3d at 273; *see also Hartzler*, 2024 WL 3219489, at *3 (plaintiff "provides no evidence that" supervisor" did not believe [her behavior] was inappropriate").Mera

also argues that "she maintained contact with Ms. Johnson," Br. at 43, but even if so, that is immaterial, as this task required Mera to do far more than just maintain contact with Johnson. Plan (R.27-5) at 5, JA555.

Notably, Mera does not challenge other aspects of Powers' findings regarding this task. Powers found that "[o]n the morning of the call, Ms. Johnson had to follow-up twice to get the necessary edits completed before the [presentation] that noon." Decision (R.27-6) at 3, JA664. "Given [Mera's] length of service at [the Office]," Powers explained, Mera "should have followed through on making the edits on the morning of the [call]." *Id.* Moreover, Powers wrote, Mera's "emails questioning the priority of finalizing the [ ] PowerPoint as opposed to reviewing grantee reports were inappropriate," because "as an experienced GS-13, [Mera] should have known the order of importance for such projects." *Id.* at 4. Last, Powers wrote that she "did not receive emails from [Mera] showing [that she] tried to organize a topic area to discuss" for the call even though "[t]his was a key part of [the Plan]." *Id.* "Because of the importance of the call in [the Plan]," Powers wrote, Mera "should have taken initiative to figure out which section of the [call she] would be facilitating—either by sending follow up emails or by calling Ms. Johnson directly." *Id.* Tellingly,

Mera does not dispute Powers' findings as to any of these matters, which themselves amply support Powers' conclusion that Mera failed the task.

## C.    Award Package (Redbooking)

This task required that Mera

> generate your assigned Redbooks in accordance with [Office] policy and procedures. All Redbooks must contain accurate and complete information. Any one Redbook that contains more than three errors, including, but not limited to, incorrect budget code, corrections to the salutation, authorizing official, and/or have missing field, will constitute failure of this task.

Plan (R.27-5) at 7, JA557.

In concluding that Mera failed this task, Powers explained that "four [of Mera's] Redbooks were sent back by reviewers with errors, at least one of which contained more than three errors, and eight Redbooks were returned between two and five times due to multiple errors and omissions, including inaccuracies in the project description and incorrect address, salutation, special condition, award amount, or award type (new or supplemental)." Decision (R.27-6) at 5, JA666.

Mera disputes none of this. She instead tries to argue that she never received "a structured training" on how to create Redbooks, Br. at 21, but as Powers noted, Mera was in fact "provided Redbook training as recently as on or about May 9, 2019," six months before the Plan began. Decision

(R.27-6) at 5, JA666. And perhaps more importantly, Powers wrote, Mera had "almost 20 years of experience" in drafting Redbooks, "nine of which were under Ms. Johnson." *Id.* Indeed, Mera had "been responsible for drafting Redbooks each year as part of the grant cycle." *Id.* Accordingly, Powers reasonably determined that Mera "should have understood what was required and what Ms. Johnson's expectations were." *Id.*

Equally meritless is Mera's claim "that the need for modifications to her Redbooks did not come from errors but from differences in style." Br. at 44. Mera offers no evidence for this claim, which rests entirely on her subjective opinion on the seriousness of the flaws in her work. But as explained, Mera's opinion that her Redbooks were adequate is irrelevant to whether Powers sincerely believed they were deficient. *See Hairston*, 773 F.3d at 273. And the defects that Powers identified in Mera's work went beyond stylistic quibbles. As Powers wrote, Mera's Redbooks "were missing critical pieces of information." Decision (R.27-6) at 5, JA666.

Last, Mera argues "that upon receipt of the requested style changes she made all of Johnson's revisions," Br. at 44, but even if that is so, it is immaterial. The task required Mera to generate adequate Redbooks that did not require extensive revisions in the first place. Plan (R.27-5) at 7,

JA557. And regardless, as Powers found, Mera's Redbook revisions were themselves inadequate. Powers wrote that "in some cases, after sending the Redbook back to [her] for changes several times," Johnson ultimately "had to make the changes herself." Decision (R.27-6) at 5, JA666.

### D. Program Plan

This task required that Mera

> fully participate in the development of the unit's program plan by providing feedback and input that reflects gaps in application submissions, issues raised by grantees and/or priorities previously identified by the team for management review and approval. Failure to actively engage in discussions with unit members and/or offer solutions to the unit's program plan will constitute a failure of this task.

Plan (R.27-5) at 7-8, JA557-58.

In concluding that Mera failed this task, Powers found that "there was basic information missing from the program plan [that she] drafted." Decision (R.27-6) at 6, JA667. She also found that "[t]he draft program plan shows routine inquiries [that Mera] raised with Ms. Johnson when the information could have been found elsewhere," and that Mera's "plan was missing key elements that should have been known to [Mera]—such as the description of the Campus program, the Management Initiative

Tracking [ ] schedule, and the amount of funding available for the program, and the other items identified for this task in the proposal." *Id.*

Mera disputes none of this. She argues only that "she provided a draft of the program plan," Br. at 42, but even if true, that is immaterial, as Mera's draft was missing important information that she should have included, which she does not deny. Nothing in the Plan said that simply turning in any draft, even a grossly deficient draft, constituted success on the task. Plan (R.27-5) at 7-8, JA557-58; *see also Hartzler*, 2024 WL 3219489, at *4 (no genuine dispute that supervisor "did not honestly and reasonably believe" employee's work product "did not provide necessary context" because it "was not so clear as to cast doubt on [the supervisor's] contrary belief"). Mera asserts that "she was not provided the opportunity to complete the process," Br. at 42, but offers no factual support for this claim. "Such a vague and conclusory statement is inadequate to support summary judgment." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 470 (D.C. Cir. 2014) (quotation marks omitted); *see also, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("conclusory allegations [in] an affidavit" do not create genuine dispute); *Camara v. Mastro's Rests. LLC*, 952 F.3d

372, 375 (D.C. Cir. 2020) ("an affidavit lacking specific facts or support from the record is . . . insufficient to create a genuine factual issue").

Mera's remaining arguments lack merit. She claims to have "timely provid[ed] a draft of the Campus Program Plan" and "collaborat[ed] with her team members in developing the plan," Br. at 42-43, but even if so, that is immaterial. As Powers noted, the task "required more than merely providing the draft within the required timeframe. It required [Mera to] provide meaningful input to the initial plan." Decision (R.27-6) at 6, JA667. Powers further noted that "[i]n leaving out critical elements about the Campus Program and priorities discussed on the call, the initial plan was incomplete and multiple sessions of editing had to take place." *Id.*

It does not matter, as Mera asserts, that Johnson "thank[ed] her for her work" and voiced "no indication that she deemed [her] contributions to be unacceptable," or that "the email exchange regarding this task does not reflect that Johnson found Mera's work on this assignment to be unacceptable." Br. at 43-44. After all, the mere fact that Johnson did not contemporaneously tell Mera to her face that her performance was poor does not mean that Mera's performance in fact was good. *See Vatel*, 627 F.3d at 1248 ("Even if [employer] failed to tell [plaintiff] how to improve

her performance," that "would not undermine" employer's explanation); *Hartzler*, 2024 WL 3219489, at *3 (fact that supervisor "failed to counsel" plaintiff "about the incident before" taking a disciplinary action was "not enough to draw an inference that [he] disbelieved [plaintiff] had acted unprofessionally"); Mera also opines that her work was good enough for the task, *see* Br. at 42, but again, her own self-evaluation is irrelevant to the sincerity of Powers' contrary view. *See Hairston*, 773 F.3d at 273.

Equally irrelevant is Mera's assertion that "she stayed involved [in] the process as she had in the past when she was rated positively." Br. at 44. The mere fact that Mera "stayed involved [in] the process," *id.*, does not mean that she performed her job adequately. Mera's past ratings, too, are immaterial to her performance during the Plan period. *See Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 236 (D.C. Cir. 1999) (rejecting idea that because plaintiff "previously received a 5- and her performance has not changed, she had to have earned a 5- for" current period); *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) ("[P]ast performance is largely irrelevant: the issue is not the employee's past performance but whether the employee was performing well at the time of his termination." (cleaned up)); *Roberts v. Int'l Bus. Machines Corp.*,

733 F.3d 1306, 1309 (10th Cir. 2013) ("[P]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality."). Even if Mera's past performance was good, that is irrelevant to the quality of her work during the Plan period.

Last, Mera disputes Johnson's finding that Mera did not take notes during the phone call about the program plan, Br. at 44-45, but Powers reasonably did not credit Mera's bare assertion on this point. Mera failed to corroborate her claim that she took notes by submitting her supposed notes to Powers in her reply to the removal proposal. Decision (R.27-6) at 6, JA667 ("Although you deny this allegation, and indicate you did take notes during the September 9, 2019 meeting, you failed to provide any written evidence to counter Ms. Johnson's assertion."). Powers was not required to accept Mera's claim that she took notes absent corroborating evidence, and Mera cannot fault Powers for failing to consider notes that she never adduced for Powers to consider. *Cf. Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("An agency cannot be faulted for failing to address such issues that were not raised by petitioners.").

### E.    Monitoring Visit

This task required that Mera

> complete your monitoring requirement by conducting two
> monitoring reviews, which includes one on-site visit to a local
> grantee and one office-based review. Failure to complete the
> two reviews will constitute a failure of this task.

Plan (R.27-5) at 10, JA560.

In concluding that Mera failed this task, Powers wrote that Mera

missed numerous pre-scheduled calls with a grantee that were necessary

"to complete [the] monitoring requirement" Decision (R.27-6) at 7, JA668.

Powers explained that on the day of the calls, Johnson had sent Mera

emails throughout the day to remind her to make the calls, but even after

Johnson sent her these reminder emails, Mera still missed the calls. *Id.*

Powers also noted that Mera offered conflicting excuses for missing

these calls. Decision (R.27-6) at 7, JA668. In Mera's written reply, Powers

noted, Mera claimed to have thought that Lewis would cover these calls,

while in her oral reply, she claimed to have thought that Johnson would

cover these calls. *Id.*; *compare* Oral Reply at 20-22 (R.27-6), JA648-49,

*with* Written Reply at 8 (R.27-6), JA640. Mera made no effort to reconcile

these conflicting excuses. Regardless, Powers explained, neither excuse

passed muster: "Lewis made it clear that she was not a definite on the

calls," while "Johnson never indicated or implied she would take the lead on these calls." Decision (R.27-6) at 7-8, JA668-69. Regardless, Mera cannot claim to have not known she was responsible for the calls given that Johnson emailed her throughout the day to remind her about them.

Mera disputes none of this. Instead, Mera argues that she failed to conduct an on-site visit to the grantee because of "an unavoidable medical emergency for which she was admitted to the emergency room," Br. at 45, but that is immaterial. Powers did not fault Mera for missing the on-site visit or doubt her medical excuse, and her conclusion that Mera failed the task did not rest on Mera having missed the on-site visit. Decision (R.27-6) at 7, JA668. Rather, Powers found that Mera had failed the task solely because Mera skipped out on the follow-up calls with the grantee. *Id.* Notably, Mera offers no excuse for missing these calls. *See* Br. at 45.

## F.    Budgets

This task required that Mera

conduct a thorough program analysis of your assigned FY2019 budgets. This analysis must support the scope of the program and should not contain programmatic discrepancies. Your failure to conduct a program analysis of your assigned FY2019 budgets will constitute a failure of this task. Additionally, [if] the analysis is returned with more than 3 errors per budget from the Grants Financial Management Division [ ], this will constitute a failure of the task.

Plan (R.27-5) at 10, JA560.

In concluding that Mera failed this task, Powers found that "[t]here were seven significant changes and edits needed on [Mera's] budgets that required further calls with the grantees," and that "[m]ost of the needed changes appeared to be general questions that a seasoned program specialist should have known to ask the grantees." Decision (R.27-6) at 8, JA669. Powers also wrote that Mera "failed to identify multiple problems in these budgets, including missing bases for computation, errors in the mandatory technical assistance allocations, potentially unallowable costs, a potentially excessive consultant rate, and items subject to additional review under the National Environmental Policy Act." *Id.*

Mera disputes none of this. Instead, she argues that she "completed this assignment as she had done in years past, when Johnson rated her positively," Br. at 45, but even if so, that is immaterial. As explained, any positive ratings that Mera may have received for her budget work during previous review periods are immaterial to the quality of her budget work during the Plan period. *See supra* § I.D. And again, Mera's own subjective assertion that her budget work during the Plan period was adequate is immaterial to whether Powers' finding that Mera's work was inadequate

was sincere. *See Hairston*, 773 F.3d at 273. Finally, Mera argues "that she maintained communication with Johnson throughout the process, as directed," Br. at 45, but that too is immaterial. The task required Mera to do more than just maintain communication with Johnson. It required her to create adequate budgets. Powers found that Mera did not do so.

## G.  Progress Reports

This task required that Mera

> complete your review of the grantee progress reports submitted . . . by September 30, 2019. Your review of these reports must include an assessment on whether the grantee is making progress toward meeting statutory and programmatic requirements of the program and taking into account if reported activities contain allowable and out of scope activities. Your failure to conduct a thorough review of your assigned progress reports, will constitute a failure of this task. If it is determined that 5% or more of your grantee reports raise concerns as identified above this will constitute failure to meet this task.

Plan (R.27-5) at 11, JA561.

In concluding that Mera failed this task, Powers wrote that Mera's progress reports often contained "issues that should have been caught by [her] before [the reports] were approved, including possible unallowable activities, missing campus plans to train students who missed previous training days, missing details for meeting programmatic requirements,

and the other items identified for this task in the proposal." Decision (R.27-6) at 9, JA670. Powers explained that given Mera's "long experience as a program specialist, missing these items was unacceptable." *Id.*

Mera disputes none of this. Instead, Mera characterizes Johnson's revisions to her progress reports as "very few and quite minor." Br. at 46. But the defects that Powers identified in Mera's reports were neither few nor minor, as explained above. Decision (R.27-6) at 9, JA670. Regardless, Mera's own opinion that the defects in her work were few in number and insignificant is immaterial to whether Powers sincerely believed that the defects were numerous and significant. *See Hairston*, 773 F.3d at 273.

Mera's claim "that Johnson did not see fit to examine the remaining 90% of her reports," Br. at 46, meanwhile, is highly misleading. The Plan said that "5% or more of your grantee reports rais[ing] concern[s] . . . will constitute failure." Plan (R.27-5) at 11, JA561. Because Johnson already had found that ten percent of Mera's reports were defective, she had no need to review the other ninety percent of Mera's reports. Proposal (R.27-6) at 16, JA610 ("I reviewed 10% of your progress reports (six reports) . . . all six raised concerns that required the grantees to make substantive changes to their progress reports. As a result, you failed to conduct a

thorough review of at least ten percent of your assigned progress reports (all six of the progress reports that I reviewed)"). The fact that Johnson did not review the rest of Mera's reports thus certainly does not suggest, as Mera insinuates, that the errors in Mera's reports were few or minor.

Last, Mera argues "that she corrected the errors noted by Johnson," Br. at 46, but that, too, is immaterial. The fact that Mera corrected her errors after Johnson brought them to her attention hardly suggests that her performance on the task was satisfactory. After all, the task required Mera to not make the errors in the first place. Plan (R.27-5) at 11, JA561.

*     *     *

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

JANE M. LYONS
Assistant United States Attorney

_____/s/ Bradley G. Silverman_____
BRADLEY G. SILVERMAN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-2575
bradley.silverman@usdoj.gov

*Attorneys for the United States of America*

Dated: February 28, 2025

## CERTIFICATE OF COMPLIANCE
### (Fed. R. App. P. 32(a)(7)(B))

This brief is prepared using 14-point Century Schoolbook, a proportionally spaced font and—omitting the items described in Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1)—contains 12,067 words as counted by Microsoft Word 365.

_/s/ Bradley G. Silverman_
BRADLEY G. SILVERMAN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on this 28th day of February, 2025, I caused a true and correct copy of the above brief to be served upon all counsel of record by filing the brief using the Court's CM/ECF system.

_/s/ Bradley G. Silverman_
BRADLEY G. SILVERMAN
Assistant United States Attorney